# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 7, 2015 Session

## STATE OF TENNESSEE v. LAKEITH MOODY

### Appeal from the Criminal Court for Shelby County
### No. 1100888     Carolyn W. Blackett, Judge

_____

### No. W2014-01056-CCA-R3-CD  -  Filed March 15, 2016

_____

Following a jury trial, Defendant, LaKeith Moody, was convicted of first degree premeditated murder and first degree felony murder of the victim, with whom Defendant had a long-time romantic relationship. He received a sentence of life imprisonment. On appeal, Defendant argues that (1) the trial court erred by admitting acts of prior domestic violence committed by Defendant against the victim; (2) the evidence was insufficient to support his convictions; and (3) the trial court failed to merge Defendant's convictions for premeditated and felony murder into one judgment for first degree murder. After a thorough review, we affirm the convictions for first degree premeditated murder and felony murder and remand the case for entry of corrected judgment forms noting merger of the two convictions as set forth herein.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as to Convictions and Sentencing; Remanded for Corrected Judgments

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., and ROGER A. PAGE, SP. J., joined.

Stephen C. Bush, District Public Defender; and Tony N. Brayton, Lawrence White, and Kindle Nance, Assistant Public Defenders, Memphis, Tennessee, for the Appellant, LaKeith Moody.

Herbert H. Slatery III, Attorney General and Reporter; Michael A. Meyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; Patience Branham and Marianne Bell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

OPINION

*404(B) Hearings*

The following testimony was given during a pre-trial hearing.

Sergeant Erik Jensen of the Memphis Police Department testified that on the evening of October 31, 2000, he was dispatched to the Methodist Central Hospital located at 1265 Union regarding an "injured party." He spoke to the victim, who was clearly shaken and "almost incoherent at times." She had bruises on her chest and arms and a loose tooth. The victim told Sergeant Jensen that Defendant punched her in the face and chest, and he kicked her in the lower back and "choked her unconscious."

On October 6, 2008, Officers Stacy Faulkner and Irvin Ramcharan of the Memphis Police Department were dispatched to a residence on East Biscayne Road. The victim had sent a text to her employer stating that she needed help because she was being held inside her home by her boyfriend. When the Officers arrived at the house and knocked on the door, no one answered. The fire department was contacted, and the door to the residence was forced open. When the officers went inside they saw the victim standing in the hallway pointing to a back bedroom. She was crying and initially unable to speak. There were also three or four small children in the house. The officers walked to the back of the house and saw an open window. They were notified by the fire department that a male had jumped out the back window. The victim had bruises and scratches on her face and neck. She told Officer Ramcharan that she and Defendant had gotten into an argument, and Defendant would not allow her to leave. The victim told Officer Ramcharan that Defendant would not allow her or the children to answer the door when the officers arrived, and he told everyone to get away from the windows. The victim said that one of the children was injured while being "captured" by Defendant, and he would not allow the victim to take the child to the hospital. The victim told Officer Ramcharan that Defendant was beating and verbally abusing her, and he tied a baby blanket around her throat until she passed out. The victim said that Defendant told her "that he was going to do it again later but next time he was going to kill her." Defendant also said that he would kill the victim if she tried to leave. Officers searched the area but Defendant was never found. The victim signed a "Domestic Violence Hold Harmless" form indicating that she did not want a ride to a safe house or anywhere else within the city limits of Memphis.

Tori Denton is employed by the Crime Victim Center, Order of Protection Department. On October 9, 2008, the victim requested an order of protection against Defendant. The victim's statement contained information concerning the altercation with

Defendant on October 6, 2008. The victim indicated that she feared for her life, and asked the court to order Defendant to have no contact with her.

Leslie Young testified that the victim was her employee at Healing Hands Christian Academy. On October 6, 2008, the victim did not show up for work, which was unusual for the victim. Ms. Young testified that the victim texted her that afternoon and that the victim "was playing like she was texting me to tell me why she had missed work." The victim told Ms. Young that she was being held hostage by Defendant and that he had been beating her all day." The victim asked for help and "then she left the address on the text." Ms. Young called 9-1-1 and reported the information to police. Ms. Young had seen the victim injured and upset in the past. She also testified that on one occasion the victim called and said that she did not want to work that day because her face was "messed up and she didn't want the children to see her like that." The victim sounded upset during the call. When the victim came back to work a couple of days later, she had black marks around her eyes, and Ms. Young allowed her to wear sunglasses in the building. Ms. Young testified that the victim told her that on one occasion Defendant attempted to run the victim off the road. Ms. Young testified: "He was upset at her and he was chasing her in the car. He was driving one car. She was driving another one. And he - - and she said he tried to run her off the road." Ms. Young testified that the victim was very upset over the incident.

Officers Gregory Robinson and James Fort of the Memphis Police Department were dispatched to Biscayne Road on March 10, 2009, in reference to a domestic disturbance between the victim and Defendant. Officer Robinson testified:

> Sony Millbrook. She advised that her and her ex-boyfriend got into an argument. He was supposed to come over and pick the kids up and take them to the doctor. And they got into a verbal argument because he said - - she said he thought she had a new boyfriend. Well, they had a verbal altercation. And she advised that he slapped her and pulled her hair. After that she also advised that she ran outside the door. She ran out of the house and he chased behind her and stated that he was going to kill her.

Officer Robinson saw bruises on the victim's left arm, and she was hysterical and upset when he arrived. The victim was also upset because Defendant had taken her baby with him, and when he left he was driving at a high rate of speed. Defendant was leaving as the officers arrived, and Officer Fort attempted to flag him down but Defendant continued driving. The victim signed a "Hold Harmless" statement, and they found her a shelter.

3

Christine Bennett, the victim's mother, testified that the victim had five children, and Defendant was the father to four of them. Mrs. Bennett thought that Defendant was "okay" when she first met him. Approximately one year after the victim began seeing Defendant, Ms. Bennett noticed a bruise across the victim's chest. The victim indicated that Defendant caused the injury but she did not say how he caused it. The victim was in tears when she told Mrs. Bennett about the bruise. Mrs. Bennett testified that the victim also told her that Defendant had run her off the road on one occasion. The victim was crying when she told Mrs. Bennett about the incident.

Pamela Payton testified that she and the victim had been friends since the eighth grade. She first met Defendant in 1998 when he and the victim started dating. In 1999 Ms. Payton began noticing bruises and scratches on the victim's body. Ms. Payton testified that on October 31, 2000, she saw Defendant slap the victim and throw a drink in her face while they were at the Mirage, a bar. The victim got into the car with Ms. Payton, and the victim was nervous, shaking, and rocking. The victim wanted Ms. Payton to get her home before Defendant arrived. When Ms. Payton and the victim got home, they put "chains and stuff" on the door. Defendant arrived approximately one hour later, and he was beating on the door and kicking it, and he was cursing. Ms. Payton threatened to call police, and Defendant finally left. After the victim calmed down, Ms. Payton left.

Ms. Payton testified that she visited the victim at the emergency room when Defendant knocked the victim's front tooth out. Ms. Payton agreed that the incident also occurred on October 31, 2000. She testified that the victim had scratches on her neck, and her right eye was red. Ms. Payton testified that the victim was "crying and kind of nervous and scared." At that point, the victim wanted to leave Defendant.

Ms. Payton testified that in 2000, "not too long after that [Defendant] found some birth control pills in [the victim's] apartment," and "he beat her." The victim called Ms. Payton the next morning and said that she needed to go to the hospital because she was having a miscarriage. Ms. Payton was unable to pick the victim up, and someone else took her to the hospital.

Ms. Payton testified that on October 8, 2008, the victim was living on Biscayne Road in Westwood. She said that Defendant held the victim hostage, and the victim texted her boss. The victim called Ms. Payton after the incident and told her what happened. The victim was "[s]till shaken up" when she called Ms. Payton.

Ms. Payton testified that she last spoke to the victim the day before the victim's disappearance. The victim told her there was a lot going on, and she was pulling up to a hotel. Ms. Payton testified that the victim said that she had something to tell Ms. Payton,

4

and "if she left the hotel or he left first, she will call me back and tell me what was going on." Ms. Payton testified that Defendant would keep "everybody" away from the victim.

Ms. Payton testified that she recalled an incident in 1999 when the victim moved into an apartment in the Frayser area of Memphis. On one occasion, the apartment complex called the victim at work and notified her that there had been a disturbance at her apartment. The victim's furniture was cut, her clothes were taken, her television was busted, her food was "slung all over the wall," and her hair care products were "slung up and down the stairway." The mirror read, "Kee Kee loves you," which was written in red fingernail polish. Ms. Payton noted that Defendant's nickname was "Kee Kee."

There was a second jury-out hearing mid-trial to determine whether the testimonies of Cevin Jefferson and Christina Crim concerning two altercations that took place several days prior to the victim's disappearance were admissible. The trial court heard Ms. Crim's testimony but then excluded it because Ms. Crim had inappropriate communications with other witnesses outside of the courtroom.

Cevin Jefferson testified that he was employed as a security guard at the Budget Lodge on Brooks Road. On the evening of January 22, 2010, Mr. Jefferson saw Defendant driving a red Mitsubishi in the parking lot of the hotel at a high rate of speed. He walked around to the area of the parking lot where the car was parked and saw Defendant standing in the parking lot yelling at the victim who was standing on the second floor balcony. Mr. Jefferson testified that Defendant and the victim exchanged obscenities, and Defendant attempted to throw a plastic bag up to the victim. Defendant was finally able to throw the bag up to her.

Mr. Jefferson approached Defendant and told him to be quiet. Defendant walked away, and the victim walked inside a hotel room. Mr. Jefferson watched Defendant use a key card to walk into another hotel room on the third floor. Mr. Jefferson went to hotel office, and Defendant entered the office approximately three minutes later. Defendant seemed agitated. Mr. Jefferson testified that Defendant was instructed to place all of the key cards in his possession on the counter. Defendant then produced the keys to three separate hotel rooms. Mr. Jefferson testified that he left the office and saw Defendant speaking with the hotel manager. When Defendant left the office, Mr. Jefferson spoke to Defendant about the noise, the kids, and Defendant's driving.

Mr. Jefferson testified that approximately one-half hour later, Defendant asked to change rooms. He and the victim moved to Room 222. Mr. Jefferson testified that that evening, on January 23, 2010, he heard a man and woman yelling and screaming. Mr. Jefferson positioned himself where he could see that the altercation involved Defendant, but Mr. Jefferson could not see the woman. However, he testified that it was the woman

"from room 222." Mr. Jefferson testified that the night manager of the hotel decided that Defendant needed to leave the premises. The manager then spoke to Defendant, and Defendant left. On cross-examination, Mr. Jefferson testified that there was no physical violence during the two altercations, and he did not actually see the victim during the second altercation.

*Testimony and Other Evidence Presented at Trial*

Cevin Jefferson testified that on the evening January 22, 2010, he was working as a security officer at the Budget Lodge on Brooks Road in Memphis when he saw Defendant drive a red Mitsubishi car into the parking lot of the hotel. He said that Defendant was driving very fast. Mr. Jefferson walked around to the area of the lot where the car was parked. Defendant was standing in the parking lot and yelling "obscenities" at a woman, later identified as the victim Sony Millbrook, who was standing on the balcony of the second floor of the hotel outside of Room 254. He said that Defendant appeared to be agitated. Mr. Jefferson testified that children were also present on the balcony at the time, and Defendant attempted to "throw some kind of a commissary bag, plastic bag that was tied with some items in it, up on to the breezeway." Defendant eventually threw the bag onto the balcony. Mr. Jefferson testified that Defendant continued yelling, and he was getting louder. At that point, Mr. Jefferson approached Defendant and told him that they could not be in the parking lot making noise. He also told Defendant that he could not throw items up on the balcony and that Defendant needed to finish his conversation in the woman's room. Defendant was not happy and told Mr. Jefferson to "mind [his] own business." Mr. Jefferson testified that Defendant walked over to a car, locked it, and walked away.

Mr. Jefferson testified that he followed Defendant who went into Room 316 on the third floor. Mr. Jefferson contacted the front desk clerk who informed him that the room was not registered to anyone. Mr. Jefferson proceeded to the front desk to get a key to the room. Within a few minutes of Mr. Jefferson arriving at the front desk, Defendant walked in. Mr. Jefferson testified that Defendant was very upset and appeared ready to attack Mr. Jefferson. Defendant began cursing and arguing with Mr. Jefferson who told Defendant to give any room key in his possession to the hotel manager. Defendant eventually gave the hotel manager three keys that were in his pocket. Mr. Jefferson spoke to Defendant again as Defendant left the office, and he saw Defendant walk away around the corner.

Mr. Jefferson testified that he walked up to Room 316 to make sure that it was secure, and he observed another plastic bag containing soda and a candy bar on the bed. He took the bag to the front desk clerk, and a call was made to Room 254. At that point, Mr. Jefferson was informed that the room occupants wanted to change rooms. Mr.

6

Jefferson was given the keys to a couple of rooms to show them. Defendant showed up, and Mr. Jefferson showed him three or four different rooms. Defendant eventually decided on Room 222 for himself, the victim, and their children

Mr. Jefferson testified that he again observed Defendant yelling at the victim a day or two after January 22, 2010. Mr. Jefferson started to tell Defendant to leave the property but the front desk clerk stopped Mr. Jefferson, and she attempted to speak with Defendant to diffuse the situation. Defendant walked down to the parking lot, and Mr. Jefferson told him not to come back that night. Defendant left in the red car.

Mr. Jefferson testified that on January 27, 2010, he was called to Room 222 to check the room and then lock it because the hotel bill had not been paid. In the room, Mr. Jefferson observed children's clothing, bags, and various items all over the floor. One of the beds had bags and clothes on it, and the other bed was made and had nothing on it. Mr. Jefferson then looked in the bathroom and verified that no one was in the room. He did not notice any unusual smells in the room.

Mr. Jefferson was again called to Room 222 on a later date to lock it because once again the hotel bill had not been paid. He knocked on the door, and a boy, approximately fourteen or fifteen years old, answered the door. Mr. Jefferson immediately noticed a "really bad smell coming from the room." He advised the boy that he was locking the room, and he took the boy to the front desk because there was no adult in the room. Mr. Jefferson did not enter Room 222 at the time. He later told the hotel manager that it smelled as if someone had died in the room. Mr. Jefferson testified that a few days later, he and the front desk manager were looking for a refrigerator for another guest. They decided to check for one in Room 222. The front desk manager went inside the room and then noted that the room would need to be deep cleaned because of the smell.

At some point, Mr. Jefferson was contacted by police about the victim being a missing person. Mr. Jefferson spoke with the housekeeping manager and asked him to check for blood or evidence of cleaning solution when Room 222 was deep cleaned. Within ten minutes, the housekeeping manager asked Mr. Jefferson to follow him back to Room 222. The victim's body was located under the bed springs and mattress of one of the beds in the room. Mr. Jefferson and the housekeeping manager exited the room, and Mr. Jefferson locked it and called police.

In January of 2010 Nathaniel Lewis was employed as the housekeeping manager of the Budget Lodge on Brooks Road. At approximately 11:00 to 11:30 a.m. on January 27, 2010, Mr. Lewis went into Room 222 to inform the victim and Defendant that they either needed to check out or pay the hotel bill. Mr. Lewis knocked on the door and spoke with the victim through the window. He did not know if anyone else was in the

7

room at the time. Mr. Lewis returned to the room several times. He knocked on the door between 2:00 and 2:30 p.m., and Defendant spoke to him through the window. Mr. Lewis could not see in the window because the lights were off. He did not hear any noises in the room. Mr. Lewis informed Defendant that the hotel bill needed to be paid, and Defendant indicated that his mother was on her way to the hotel to pay the bill. Mr. Lewis testified that no one came to pay for the room.

The following day on January 28, 2010, Mr. Lewis was informed that no one paid for Room 222. He walked into the room and began to bag and tag the items that were left there. The items were eventually placed in storage. Mr. Lewis testified that one of the beds in the room was piled with clothes. He also saw a large black trash bag.

Mr. Lewis testified that other individuals stayed in Room 222 after he cleaned it. He said that the room was cleaned sometime near the end of January. Mr. Lewis testified that a man and his son rented the room for thirty days during February of 2010 into March of 2010. The man did not want the room cleaned while he was renting it. Mr. Lewis testified that he began hearing complaints about a bad odor coming from the room in early February before the man moved in for thirty days. Mr. Lewis said that the carpet in the room was shampooed after the initial complaint of the odor. He did not smell anything after the carpets were shampooed. Mr. Lewis testified that there were later complaints about the odor from Room 222, but no one went inside while the man was renting it because the man refused housekeeping services.

Mr. Lewis testified that after the man and his son left the hotel in March, Mr. Lewis had the carpets in the room cleaned again. The housekeeping staff also "deep clean[ed]" the room which involved washing the linens, shower curtain, and curtains. After the cleaning, Mr. Lewis noticed that the smell in the room was still there and much stronger. Sometime later, Mr. Lewis discussed the odor in the room with Mr. Jefferson, the security guard. Mr. Jefferson asked Mr. Lewis to look in the room to see what he could find. Mr. Lewis then went back inside Room 222 to search for the source of the bad odor. He said that there were two different types of beds in the room. One had legs and an open space underneath. The other bed had a mattress and box springs with an enclosed frame that resembled a box. When Mr. Lewis removed the mattress and box springs from the enclosed frame, he found the victim's body. She had a "coaxial cable" wrapped around her neck, and dryer sheets had been placed with her body. Mr. Lewis then notified Mr. Jefferson of what he found, and they called Detective Sergeant Michael Brown of the Memphis Police Department.

Edwina Hankins testified that in March of 2010, she was working as a volunteer probation officer with Juvenile Court. On March 2, 2010, Ms. Hankins went to the Budget Lodge on Brooks Road to visit a father and son staying in Room 222 while their

8

house was being renovated. As she approached the room, the door was open, and Ms. Hankins noticed a "very foul smell, very strong." Ms. Hankins testified that the occupants of the room had air fresheners in the room. She looked in the room but did not find the source of the smell. Ms. Hankins found it strange that the bed nearest to the door did not appear to be disturbed. The bed near the bathroom appeared to be the only one slept in. The father placed a chair in between the two beds for Ms. Hankins to sit in. She noticed that the smell was stronger toward the door. Before she left, Ms. Hankins told the father that he needed to switch rooms or have the room checked.

Sergeant Ruth Horne of the Memphis Police Department testified that she was employed with the crime scene division in March of 2010. She was dispatched to the Budget Lodge on March 15, 2010, to process Room 222. Sergeant Horne noticed the odor of "death and decay" before she got to the room. The box springs and mattress were removed from the bed near the door, and Sergeant Horne saw the victim's body lying on the floor. Sergeant Horne explained that the box springs had been laying on the victim's body, and there were indentations from the box springs on the body. There were two areas of broken wood on the box springs.

Sergeant Horne testified that a coaxial cable was around the victim's neck, and "it kind of just went around her neck, under one of her arms, around her breast and part of it was on her back, I mean she was laying on top of part of it." Dryer sheets were on the floor near the victim's legs. There was also a towel by the victim's head, and a tote bag between her legs. Sergeant Horne testified that the victim was wearing a t-shirt and was nude from the waist down. The victim was also wearing a bracelet that read, "Are you STD free?"

Sergeant Michael Brown of the Memphis Police Department, Homicide Bureau, testified that he became involved in the present case on February 3, 2010, after a missing persons report on the victim had been taken. Sergeant Brown then went to the Budget Lodge and obtained information on the victim. He learned that the room in which the victim stayed had been cleaned up four times and rented out three times since the victim had been seen at the hotel. Someone was still renting the room at the time Sergeant Brown was there. He learned that the victim had been staying at the hotel with Defendant who had been paying for the room. Sergeant Brown also went to the storage room at the hotel and looked at the belongings that had been removed from the hotel room after the victim disappeared. He searched the clothing left in the room and did not find any blood or other evidence. Sergeant Brown also took statements from Cevin Jefferson and Nathaniel Lewis. The following day, February 4, 2010, Sergeant Brown and Lieutenant Deborah Carson went to the home of Defendant's aunt and uncle and recovered a DVD player that had been in the hotel room. He also found a wallet

belonging to the victim that had been given to Defendant's cousin, Larry Gray. Mr. Gray then delivered the items to Defendant's uncle, Alvin.

Officer Kevin Clark of the Memphis Police Department testified that in January and February of 2010, he was a detective assigned to the Investigative Support Unit. He was asked to participate in investigating the victim's disappearance and to locate Defendant. They searched for a small red Mitsubishi vehicle bearing Mississippi tags. At approximately 7:10 p.m. on February 2, 2010, Officer Clark and his partner located the car in the parking lot of a strip mall in the area of Getwell Road and Rhodes Avenue. Defendant was inside the car, and they took him into custody. Detective Samuel McMinn ran the VIN number on the car, and it came back registered to the victim. Defendant was placed under arrest for theft of the victim's car. The car was towed to the city impound lot at 465 Klinke Avenue.

Officer Jeffrey Garey of the Memphis Police Department, Crime Scene Investigation Unit, testified that he inventoried the victim's red Mitsubishi on February 3, 2010. Inside the car, Mr. Garey found four pairs of new socks, a Finish Line shopping bag, and a multi-colored blanket. The Finish Line bag contained a receipt book, receipts, and papers. One of the receipts was for items purchased at Finish Line on February 2, 2010, at 1:49 p.m., totaling $119.98, and the amount was paid in cash. There was also a Hibbett's Sports sale receipt dated February 2, 2010. Officer Garey found a pair of boots in the trunk of the car, and he also found a pair of jeans and a Nike t-shirt in the car. The shirt appeared to be new but it was dirty. A pair of Nike tennis shoes which was inside of a Kroger bag was also found in the trunk. Officer Garey found a Visa platinum check card in the car bearing the victim's name.

Sergeant W.D. Merritt testified that in February of 2010 he was employed by the Memphis Police Department, Homicide Squad. At approximately 7:45 p.m. on February 2, 2010, Sergeant Merritt was instructed to report to work and interview Defendant who had been detained in the victim's car. Sergeant Merritt and Sergeant Mundy Quinn reviewed the advice of rights form with Defendant, and Defendant waived those rights and spoke with the detectives. Defendant stated that he and the victim had four children, one of whom was nine-weeks old and had serious health problems. He also said that the victim was in school but she mostly stayed home with the children due to the nine-week old's health problems. Defendant told Sergeants Merritt and Quinn that he last saw the victim on January 26, 2010. Defendant said that he met with the victim in the hotel parking lot at approximately 7:00 a.m. and that they went back to the hotel room and were intimate and then returned to the parking lot. Defendant told the detectives that he took the keys to the victim's 1999 Mitsubishi and drove away in the car, and the victim was standing in the parking lot. The children were not at the hotel at the time. When asked how the victim would pick the children up from school if Defendant had her car,

10

Defendant indicated that the victim planned to use her school loan and income tax money to purchase a new vehicle. Defendant told Sergeants Merritt and Quinn that from January 26, 2010, until he was taken into custody on February 2, 2010, he had been living in the victim's car and using the Exxon to clean up and shower.

Sergeant Merritt testified that he and Sergeant Quinn then confronted Defendant with evidence that he had stayed at another hotel after January 26, 2010. Defendant then said that he had stopped by a house on Gotten Street. When the detectives told Defendant that they were going to speak with his mother and other family members, Defendant refused to make any further statements. Sergeant Merritt noted that during the time Defendant indicated he had been living in the car, there had been periods of snow and ice. Sergeant Merritt testified that he drafted the search warrant for the victim's car, and he obtained a search warrant on February 4, 2010, to obtain DNA from Defendant. He later received fingernail scrapings and a blood sample taken from the victim during her autopsy, a hair piece, a grey t-shirt, and an AV cable which were received from the Medical Examiner's Office and sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for testing.

Dr. Karen Chancellor of the Shelby County Medical Examiner's Office conducted an autopsy on the victim. She determined that the victim died from "asphyxiation by ligature strangulation." The manner of death was homicide. Dr. Chancellor noted that it would take a minimum of two to three minutes of pressure held over both carotid arteries in a "continuous fashion" to cause death in that manner. She also noted that when the carotid arteries are compressed, a person "will go unconscious in a few seconds[.]" Dr. Chancellor testified that the victim's body was in a state of "moderate decomposition" when she examined it. The victim's toxicology report did not reveal the presence of drugs or alcohol in the victim's body.

Nathan Gathwright is employed by the City of Memphis Police Services Division as a latent fingerprint examiner. He testified that there were three fingerprints lifted from "bed pole number four" of the bed under which the victim was found. Mr. Gathwright testified that the prints belonged to Anthony Franklin who had a "Shelby County Sheriff's Office file number 3700375487." He did not know when the prints were left on the bed.

Sergeant Brad Webb of the Memphis Police Department, Homicide Bureau, was assigned as the case coordinator in the victim's case. He testified that fingerprints were taken from the bed where the victim was found. The prints came back to Anthony Franklin who Sergeant Webb pursued as a suspect in the victim's murder. Sergeant Webb testified that he received items from Sergeant Carson that had been retrieved from 1606 Gotten Street which included a wallet, two EBT cards, a DVD player, a purse, six

11

social security cards, a Tennessee identification, and miscellaneous papers. Sergeant Webb testified that he also received a license plate that was not registered to the victim but it was registered to Shamika Walton at an address in Mississippi.

Sergeant Webb testified that he printed still shots from the video of Defendant using one of the victim's EBT cards at a store. He recognized Defendant on the video, and he noted that after the transaction, Defendant got into a gold vehicle.

Agent Jessica Marquez of the TBI Crime Laboratory, Forensic Biology Section, testified as an expert in the area of forensic biology, serology, and DNA analysis. Agent Marquez examined vaginal swabs and a smear from the victim, oral and anal swabs from the victim, a ligature, a shirt and fingernail swabs from the victim, a saliva standard from Defendant, a towel, and a bag from the scene. Agent Marques found Defendant's DNA profile in the swab that was taken from the victim's fingernails.

Agent Marquez testified that she also tested an audio/video cable that had a hair piece tangled in it. She explained that the cable was "basically it's the parts that you plug in like a VCR to your TV." Concerning DNA on the cable, Agent Marquez testified: "Okay, for area a, a partial DNA profile was obtained that matches exhibit 01-f, just the shirt from the victim. At 9 of 13 areas of the gender marker amelogenin, loci FGA D18 and D7 were inconclusive due to insufficient or degraded DNA." For an area near the end of the cord, Agent Marquez also obtained a partial DNA profile matching the victim, and six of the nine areas matched that of the victim, and the gender marker was female. Three DNA profiles were inconclusive because it was insufficient or degraded. On the middle of the cord, Agent Marquez obtained a partial DNA profile that was female and matched the victim in six of nine areas. There was also a "minor contributor" of DNA on that area of the cord that was from a male individual. There was not enough DNA to tell who it belonged to. Agent Marquez could not exclude Defendant as being a minor contributor of the DNA. She noted that there were five areas on the cord that contained DNA from the minor contributor. Agent Marquez agreed that the DNA was similar to that of Defendant.

Christine Bennett, the victim's mother, testified that the victim had five children, and Defendant was the father of four of them. Mrs. Bennett testified that Defendant seemed like a nice person when she first met him but she changed her mind approximately one year later when Defendant bruised the victim's chest. The victim was very upset about the incident, and she told Mrs. Bennett that Defendant inflicted the bruise. The victim also told Mrs. Bennett that Defendant ran her off the road on one occasion. Mrs. Bennett did not recall when these events occurred.

Mrs. Bennett testified that on the evening of January 27, 2010, she received a call from the school where the victim's eldest daughter attended. The school secretary indicated that the child needed to be picked up. Mrs. Bennett attempted to call the victim but she did not get an answer. Mrs. Bennett testified that she received a second call between 5:30 and 6:00 p.m. from the child care center that the victim's other children attended. Mrs. Bennett again called the victim's phone but the victim did not answer. Mrs. Bennett picked up the eldest child, and her husband picked up the other children. Mrs. Bennett later contacted police who came to her house.

Officer Jeremy Todd of the Memphis Police Department testified that he was dispatched to Mrs. Bennett's house at approximately 10:30 p.m. on January 27, 2010. Mrs. Bennett indicated that the victim was missing and did not pick up her children from school that day. Officer Todd and his partner were informed that the victim had been staying at the Budget Lodge. Officer Todd then prepared and filed a report on the matter which was sent to the missing persons division. On cross-examination, Officer Todd noted that the victim drove a 1999 Mitsubishi Mirage.

Larry Gray, Defendant's cousin, testified that on January 24, 2010, Defendant stopped by Mr. Gray's house to pick up a DVD player that Mr. Gray had borrowed from Defendant. Defendant indicated that he needed the DVD player for his children to watch a movie. Mr. Gray testified that the DVD player had a long gray cord attached to it. Defendant visited Mr. Gray's house a few days later, and he appeared to act normal. Mr. Gray testified that Defendant was driving a gold car. He said that Defendant visited his house again sometime later, and Mr. Gray asked Defendant why he never picked the children up from school on January 27, 2010. Defendant indicated that he did not know anything about it. Defendant told Mr. Gray that "he went and got some tennis shoes and a tee-shirt, he had a charge for a pistol charge and he was going to turn himself in." Defendant also told Mr. Gray to take the DVD player to Defendant's mother. Mr. Gray testified that he asked Defendant where the victim was, and Defendant said that he did not know what Mr. Gray was talking about. Mr. Gray testified that after Defendant left, he looked in the bag containing the DVD player. He needed a longer cord for his DVD player so he switched the long gray cord in the bag with a short black cord. Mr. Gray also saw a brown Louis Vinton wallet in the bag. He later took the bag to Defendant's aunt's house and gave it to Defendant's uncle, Alvin.

Jeanice Rubin is the Director of the Apostle Deliverance Temple Child Development Academy located on Norris Road in Memphis. Ms. Norris testified that the victim and Defendant had three children, ages three months, two years, and three or four years old, enrolled the child care center in January of 2010. Ms. Norris testified that the victim, who was enrolled as a student at "Southwest," was a good parent and always picked up her children on time. She said that the victim normally dropped the children

13

off between 7:00 and 7:30 a.m., and she picked them up between 1:00 and 2:00 p.m. If the victim was going to be later than 2:00 she usually called Ms. Rubin. On January 27, 2010, the victim dropped the children off but she never called or picked them up. The victim's mother, Christine Millbrook Bennett, eventually called Ms. Rubin to see if the children had been picked up. Mrs. Bennett sent her husband to pick up the children between 6:15 and 6:30 p.m.

Panios Kareh testified that he owns a convenience store that is licensed by the IRS to cash checks and distribute money from government EBT cards. He explained that a food stamp card has two sides. One side is to purchase food and the other side, the EBT side, has a cash benefit. Mr. Kareh testified that he was familiar with both the victim and Defendant who occasionally came into the store. The victim usually came into the store on the first of each month to draw cash from her EBT card. Mr. Kareh testified that his store security system consisted of sixteen cameras. He gave a copy of video surveillance from a transaction that occurred in the store on February 1, 2010, at 11:38 a.m. to detectives. Mr. Kareh identified a photograph of Defendant exiting a gold sedan and walking into the store. He could not tell who was driving the car. Defendant purchased orange juice with the food stamp side of the victims' card, and he received cash from EBT side of the card. He said that Defendant drew $185.00 from the card and then purchased a tobacco product. Mr. Kareh noted that a four-digit pin number was required when using the EBT card. He said that there was no requirement to match an ID with the EBT card. The parties stipulated to EBT transactions on the victim's EBT card from January 25, 2010 until February 1, 2010.

Willie Robinson testified that he is the co-owner of Precise Automotive on Lamar Avenue. On January 23, 2010, Defendant's car, a Crown Victoria, was serviced at the shop. The work totaled $1,538.75. Defendant picked the car up but then returned it. He called and said that his brother would pick the car up. However, Police later arrived and picked up the vehicle. Mr. Robinson testified that Defendant paid for the repairs on the car.

Naresh Patel testified that he is employed by America's Best Hotel on American Way in Memphis. According to his records, Defendant checked into the hotel on February 1, 2010, and stayed in Room 126 for one night.. Mr. Patel checked Defendant's identification and made a copy of it. Defendant paid for the room in cash. Mr. Patel later gave a copy of Defendant's room registration card to police.

Lieutenant Deborah Carson of the Memphis Police Department, Homicide Bureau, testified that on February 3, 2010, she drove to the America's Best Inn and Suites on American Way to retrieve a copy of a registration card.

14

Sergeant Erik Jensen of the Memphis Police Department, Felony Response Team, testified that he was dispatched to the emergency room at Methodist Central Hospital on October 31, 2000, concerning a domestic violence call. He observed the victim who had a loose tooth and was complaining of lower back pain caused by being kicked by Defendant. The victim was crying and distraught at the time. Sergeant Jensen testified that the victim told him that Defendant became upset when she attempted to break up with him, and he assaulted her. The victim told him that Defendant "ripped off her clothes and began punching her in about the face and head, chest and arms and inside the thighs." She also stated that Defendant "choked her unconscious." Sergeant Jensen observed severe bruises on the victim's chest.

Officer Irvin Ramcharan of the Memphis Police Department testified that he and Officer Stacy Faulkner were dispatched to the victim's residence on East Biscayne Road on October 6, 2008. He said, "The victim advised her employer that she was being held there against her will by [Defendant] and she advised us that she needed help, that he wouldn't let her leave and we were dispatched to that call." When Officer Ramcharan and Officer Faulkner arrived on the scene, no one answered the door. They notified the fire department, and firemen arrived and pried the door open, and the officers announced their presence and entered the residence. The victim emerged from one of the rooms with a baby in her arms. Officer Ramcharan testified that the victim's "eyes were wide open, she had a look of panic and she was pointing frantically behind her, at the rear room." The officers walked to the bedroom and found other children in the room who appeared "confused and frightened." No one else was in the room, and the window was open. The victim was terrified and could not speak at first. She eventually told the officers that she and Defendant had gotten into an argument that morning, and Defendant refused to allow the victim to leave or take the children to school. He told her that he would kill her if she left. The victim told the officers that Defendant beat and verbally abused her, and at one point he strangled her with a blue blanket until she was unconscious. The victim said that when she woke up, Defendant told her that he would strangle her again until she was dead. The victim was finally able to text her employer, Leslie Young, and ask her to notify police. The victim had scratches and bruising on her neck. The officers searched the neighborhood but could not find Defendant. The victim refused transportation to the hospital and left the residence with her children in her vehicle.

Leslie Young was employed by the Healing Hands Christian Academy in 2008, and the victim was one of her employees. She said that the victim was a good employee. On October 6, 2008, the victim did not report to work, which was unusual. Ms. Young testified that the victim texted at approximately 5:00 p.m. and said that she was being held against her will by Defendant and that he had been beating her all day long. The victim also asked for help and gave her address. Ms. Young called 9-1-1 and gave the dispatcher the information.

15

Ms. Young testified that on another occasion, the victim called her and said that she did not want to come into work because she and Defendant had gotten into a fight, and the victim's face was bruised. Ms. Young saw the victim a day or two later, and she was still bruised under her eye. Ms. Young allowed her to wear sunglasses while at work.

Tori Denton is employed by the Crime Victim Center, Order of Protection Department, located at 1750 Madison Avenue in the Family Safety Center. Her duties included interviewing complainants that come to the center to file for "Court ordered protection." On October 9, 2008, the victim came to the Crime Victim Center to request an order of protection which would have been submitted to a judicial commissioner. Ms. Denton did not know if the victim's request was granted. She said that the victim's statement for the request no longer existed due to the length of time since the request. She said that the paperwork was kept "[u]p until either that six months or the five years[.]" [sic] The State introduced a document which was printed from a database that contained Ms. Denton's interpretation of the victim's statement. The narrative on the document contained the following:

> The victim's former boyfriend and father of her children, [Defendant] began striking her with his fist, several times on her head. Victim states that [Defendant] was upset with her and he began choking her with a baby blanket that he wrapped around her neck. Victim states [Defendant] flipped her over on her stomach and would not let her leave the residence. Victim states that she was able to text message her boss for help. Victim states her boss telephoned the police. Victim states when the police arrived [Defendant] had left the scene. Victim states a police report was taken, along with pictures of her injuries. This incident occurred at their shared residence, which the victim has since left. Due to the above, the victim fears for her safety and would [sic] for [Defendant] to be ordered by the Court to have no contact with her.

The parties stipulated that the victim's petition for an order of protection was automatically granted without a hearing "pursuant to regular court procedures." A hearing was scheduled for October 23, 2008. The victim failed to appear for the hearing, and her order of protection was dismissed by the Judicial Commissioner.

Officer Gregory Robinson of the Memphis Police Department testified that he was dispatched to a disturbance call on Biscayne Road on March 10, 2009. He spoke to the victim who was "real hysterical, scared, just telling us what happened." Officer Robinson testified that the victim said that "her boyfriend, ex-boyfriend [Defendant]

came over to the house to take the kids to the doctor and she said that they got into a verbal altercation, because [he] thought she had another boyfriend." The victim told the officer that the Defendant then slapped her and pulled her hair. She ran outside the house, and Defendant followed her and said that he was going to kill her. Officer Robinson noticed bruises on the victim's left arm. Officer Robinson testified that the victim signed a "hold harmless" form, and she was taken to a shelter. On cross-examination, Officer Robinson noted that the victim was not at the residence when he first arrived. She walked up to him a couple of minutes later. Officer Robinson testified he saw a car speeding away from the residence when he arrived, and the victim later advised him that Defendant was driving the vehicle, and he had taken one of the children.
Analysis

## I.        *Admission of Prior Acts of Domestic Violence*

We initially note that the State, citing *State v. Canon*, 254 S.W.3d 287, 301-303 (Tenn. 2008) and *Crawford v. Washington*, 541 U.S. 36 (2004), addresses the Confrontation Clause in its response. However, Defendant has not raised any Confrontation Clause issues on appeal. Therefore, we decline to address whether the Confrontation Clause was violated by any testimony presented in the trial.

Defendant contends that the trial court erred by allowing the "jury to hear evidence of prior acts of physical and verbal abuse allegedly committed by [Defendant] against the named victim, Sony Millbrook." We find that the trial court did not abuse its discretion by admitting the evidence.

It is well-established precedent "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tenn. Rule of Evid. 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the

evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

The rationale underlying Rule 404(b)'s exclusion of evidence of a defendant's prior bad acts is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id*.; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

In this case, the trial court held a pretrial hearing to determine whether to admit evidence of prior acts of domestic violence against the victim by Defendant that occurred on October 31, 2000, October 6, 2008, and March 10, 2009. The trial court heard testimony from the victim's mother Christine Bennett, Sergeant Erik Jensen of the Memphis Police Department, Officers Irvin Ramcharan, Stacy Faulkner, James Fort, and Gregory Robinson of the Memphis Police Department, the victim's former employer Leslie Young, Tori Denton, and Pamela Payton. The testimony of those who testified at trial is summarized elsewhere in this opinion. Ms. Payton did not testify at trial.

The trial court made extensive findings at the conclusion of the 404(b) hearing concerning this issue. In particular, the court found:

> Although the Rule 404[b] does not explicit[ly] list the exceptions under the evidence of prior crimes, wrongs, or acts, which may be admitted, ou[r] Courts have held that such evidence may be admissible to show another purpose, such as motive, intent, guilty knowledge, identity of a defendant, absence of mistake, or the existence of a common scheme. And that is precisely where this Court is going to concentrate on whether or not the evidence that was brought to the Court's attention, during the hearing and whether or not that evidence should be admitted.
>
> In the instant case it seems that the relationship between the defendant and the victim planned [sic] this [sic] over a number of years. And as everyone knows, particularly as history, as well as legal cases point out, one of the most difficult trials to prove in any Court, Criminal Court, is domestic violence. Because you can, as accurately described by Mr. White, have a train of events that starts out with an intent, with certain

18

words that are said and over a period of even twenty-four hours, forty-eight hours, or a month, a number of events can occur that would end up with the victim being killed and being able to go back and trace those statements, being able to trace the motive, being able to trace the propensity [sic] and particularly being able to trace the premeditation.

In the instant case we have a very unusual situation, in that, the act[s] that you all wish to show, the choking, the going to the hospital, the incident in the apartment and where all of the furniture was completely, basically, demolished and several incidences [sic] where there are witnesses to testify that she made, quote, unquote, certain excited utterances about what was going on, that she was nervous, that she had suffered verbal abuse, as one could probably characterize it, that those incidences [sic] that have been mentioned by counsel occurred over a number of years.

The problem with any domestic violence case is that they are always, in most cases, a number of incidences [sic] that could of taken place several months, or over a period of years, one that are never reported; two that are never considered by anyone as being something that should have been reported, or in a situation like this it could be that one of the reasons there was a number of huge space [sic] between reporting such incidence [sic] is because the defendant was not at the residence, or not with the victim at the time.

Those are all questions that if this evidence goes to the jury, the jury needs to take a look at all of that, timing, the reasonable amount of time between the separate incidents, the totality of the circumstances. The argument has been made by counsel that these incidents started within six months of the relationship, that is something for the jury to consider, because I have to sit here and weigh back and forth between the possibility that the violence, the premeditation could have started within six months of the relationship, or as so adequately argued by the defense is that, there were a number of arguments, they could have been just normal arguments, that over a period of time there was a major incident that ended up in the death of Sony Millbrook.

The problem that I have at this point is that when I look at the law, the law basically, sets out what the test is. And for the record, the Court must request [sic] and hold a hearing outside of the jury's presence, which this Court had complied with, on two occasions, not only last

19

week when we did about a three hour hearing, but again, today, when counsel was allowed by the Court to reiterate your arguments, which took another hour, or so. And so, we have had that argument by both sides. Both sides have presented their positions.

Number two, the Court must determined that a material issue exist[s], other than the conduct conforming with the character trait and must, upon request, state on the record, the material issue, the ruling and the reasons for admitting the evidence.

In this particular case the material issue is premeditation. I have already said that I do not feel like prior bad acts, or propensity is something that should be considered [sic].

The ruling of the Court, specifically, is that there is enough evidence from the report of the police officers and that they saw and what they described, the fact that [the victim] was in the hospital, the fact that she had bruises, the fact that she was able to communicate where and whom the bruises resulted from.

There was testimony from a friend of hers, I don't recall their specific names, about certain excited utterances, about certain things that had happened. I do remember the incident at the apartment where there was a phone call to the girlfriend that there was something going on at the apartment and when she got there the apartment it was pretty much demolished, in terms of the sofas, the bed and food out of the refrigerator, threw products out of the bathroom, strewn all over the walls and the floors.

All of that seems to indicate to this Court that there was some intent by Defendant to do harm, or to kill this victim. One of the things that makes it very difficult and the reason why the Court is going to allow that evidence in is because, in this particular case, as in the Smith case and a number of other cases that this Court has reviewed, is that, as with most domestic violence cases, there are no witnesses.

This is a typical case in which two people were seen by certain other witnesses to be in, around, about, the location of the Budget Hotel. The last time that Ms. Millbrook was seen was with the defendant and we have, as a result of whatever may have occurred, a situation in which the result was a body that was up under a mattress, box springs and leading

20

up to that a number of incidences [sic] which this victim clearly felt threatened, felt that there was an intent by [Defendant] to harm her. There were actual incidences [sic] in which he did harm her. There were actual incidences [sic] that she told people certain things had occurred and there was even testimony from her own mother as to what was going on in this relationship.

I do agree that there exist[s] a larger span of time than one would ordinarily like to see, in terms of over the years. But, there is nothing in the law that says that it has to be a certain amount of time, in terms of one year, six months, three years, twenty-four hours. It is whether or not it shows a material issue exist[s] and this case, because of all of the testimony that this Court has heard, the reports, particularly from the police department, the injunction that was requested, all of this tends to show a very, very extremely violent relationship that was going forward over the years and there is enough proof, enough questions and enough facts that have been adduced by the State to show that there was premeditation, or an intent on the part of this party to do severe harm to this victim.

So therefore, the reasons for admitting the evidence is that the Court finds that there was premeditation by the defendant, over time, even though that time is not over a six month, or a year period, but there were numerous incidences [sic] which indicated that the defendant had intent and had premeditated harming [sic] this victim.

The process, in terms of weighing – and you all have gone back and forth over what the test is, whether or not it is simply a situation in which it outweighs the unfair prejudice.

This Court rules that it does not outweigh the prejudice [sic]. That even though you can make an argument that is dangerously close to outweighing, that we looked at the entire situation and you go through each one of the steps that have been laid out by the Court in numerous cases that this does not outweigh the result of unfair prejudice of the victim [sic].

We have a victim here. We have facts that seem to indicate that there was an intent, a very strong intent, over a number of years to harm the victim. The Court feels that this alone is clear and convincing, that this was not just an ordinary relationship. This was not just an ordinary

21

situation in which there were arguments between two people and there were discussions and one person may have lost it for a minute, or one person may have gotten extremely upset, but there was consistent injury, consistent harm, consistent fear, all the way through those years and they will be shown on the stand by the witnesses when they testify and the Court will not exclude this evidence, because the Court feels the probative value is not outweighed by the danger of unfair prejudice.

To the contrary, this Court believes that this is truly a jury question, that the jury needs to determine, based upon the other case law that I have and that has been cited by counsel, as to whether or not a review of the record indicates that the Trial Court substantially complied with the requirements in Rule 404[b] and that the Trial Court's admission of the challenged evidence should be included in the trial [sic].

Arguably, the evidence is relative.  It is premeditated.  It shows intent and it particularly shows the motive of the defendant as to the killing of the victim.

The witness who observed the unusual behavior, the way the testimony was seen by this Court as to the incident in which Ms. Millbrook was very upset, barely able to talk, excited utterances based upon what had happened, all of those things indicate a stream of basically incidents that can be pooled together to show what she was going through, throughout that entire period, even though the argument by counsel, as defense counsel said, that it wasn't consistent on a daily basis, there was something that didn't happen twenty-four, or forty-eight hours, or a week or two weeks.

I think there is no rule there in terms of domestic violence [sic].  There are cases of domestic violence that technically last ten, fifteen, twenty years, somebody gets beaten every day, or gets beaten every first Sunday of the month for ten, or fifteen years, I think you can still make the argument that that's domestic violence and that dependant on how severe that beating is, that there's premeditation and intent to harm the victim.

Sony Millbrook's statements were, in fact, excited utterances and do fit the characterization of what is included in 404[b].  This will be examined much more closely during the actual testimony.

The Court does warn the State that if these exceptions are not met with Tennessee Rules of Evidence that those statements, if they differ from the statements that have been presented so far to this Court, they will not be allowed.

I will say that based upon all the research this Court has done, this is a very close question, it is a very difficult question, because domestic violence cases are extremely, extremely hard. You have a victim, you have a defendant and in most cases there are no witnesses. And so, therefore, anything that can help prove what exactly happened in this case should be utilized, as long as it is within the framework and the departments of the law and the cases that have been set forth before this.

However, the bottom line, as far as this Court is concerned is that the probative value is not outweighed by the danger of unfair prejudice and therefore the evidence will be allowed to prove that the defendant used premeditation in the killing of this victim and that is the Court's ruling.

The trial court held another jury-out hearing during trial to determine whether Cevin Jefferson would be allowed to testify concerning two arguments that he witnessed between the victim and Defendant a few days prior to the victim's death. The trial court heard Mr. Jefferson's testimony which is also recited elsewhere in this opinion and found that there was no 404(b) issue and that Mr. Jefferson's testimony was "just part of the facts that come in, in terms of that was observed, what they saw and it's basically a jury question."

Our review of this issue shows that the trial court followed the procedural requirements of Tenn. R. Evid. 404(b). Because the court adhered to those requirements, our review is limited to whether the admission of the evidence qualified as an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see also State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000).

In our view, the trial court did not abuse its discretion by admitting testimony concerning the prior acts of domestic violence against the victim as testified to at trial by victim's mother Christine Bennett, the officers who responded to the calls on October 31, 2000, October 6, 2008, and March 10, 2009, and observed the victim's appearance and demeanor, the victim's former employer Leslie Young, and Mr. Jefferson. The State argued, and the trial court found that the victim's statements to Ms. Bennett, the officers, and Ms. Young were excited utterances as set forth in Tenn. R. Evid. 802, and Mr. Jefferson observed the two arguments between Defendant and the victim prior to the victim's death. The testimony by Tori Denton, an employee of the Crime Victim Center,

23

Order of Protection Department, was properly admitted under the business records exception to the hearsay rule as argued by the State at the 404(b) hearing. Tenn. R. Evid. 803(6). The witness' testimony was relevant to the issue of Defendant's intent and motive in strangling the victim, and the prejudicial impact of the testimony did not outweigh its probative value. As argued by the State, evidence of Defendant's prior acts of domestic violence against a victim are probative to the issue of premeditation because "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1994). Accordingly, this issue is without merit.

## II.     *Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his convictions for premeditated first degree murder and felony murder. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." *Suttles*, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are

24

several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id*.; *see Bland*, 958 S.W.2d at 660.

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft." T.C.A. § 39-13-202(a)(2). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103.

To support a felony murder conviction, the intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Although the intent to commit the underlying felony cannot be presumed from the act of committing the felony, a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to or concurrent with the killing. *Id*. at 108.

First, Defendant does not dispute that he killed the victim, which is supported by the proof presented at trial. Rather, he argues that the evidence was insufficient to show that he acted with premeditation. However, in a light most favorable to the State, the proof shows that the victim and Defendant had been in a relationship for several years prior to the victim's death, and they had four children together. There were several instances of domestic violence during the years of their relationship. The victim's mother, Christine Bennett, testified that approximately one year after the victim began dating Defendant Mrs. Bennett saw a bruise on the victim's chest. The victim was upset about the incident and told Mrs. Bennett that Defendant inflicted the bruise. There was testimony by police officers that Defendant choked the victim on at least two prior occasions to the point that she lost consciousness. On October 31, 2000, Sergeant Jensen observed the victim at Methodist Central Hospital. She had a loose tooth and was complaining of lower back pain from being kicked by Defendant. The victim told Sergeant Jensen that Defendant became upset when she attempted to break up with him, and he assaulted her. The victim said that Defendant "ripped off her clothes and began punching her in about the face and head, chest and arms and inside the thighs." The victim told Sergeant Jensen that Defendant also "choked her unconscious." Sergeant Jensen noticed severe bruises on the victim's chest.

On October 6, 2008, Officers Irvin Ramcharan and Stacy Faulkner were dispatched to the victim's residence because the victim had texted her employer and said

25

that she was being held at the residence against her will by Defendant and that she needed help. Once the officers forced their way into the residence, the victim emerged from one of the rooms with a baby in her arms. The victim told Officers Ramcharan and Faulkner that she and Defendant had gotten into an argument that morning, and Defendant refused to allow her to leave or take the children to school. Defendant also told her that he would kill her if she left. The victim told the officers that Defendant beat her and verbally abused her, and at one point he strangled her with a blanket until she was unconscious. When the victim woke up, Defendant told her that he would strangle her again until she was dead. She had scratches and bruising on her neck. Defendant fled the scene after officers arrived.

Officer Gregory Robinson was dispatched to the victim's residence on March 10, 2009. The victim was hysterical when he arrived and said that she and Defendant got into a verbal altercation because Defendant thought the victim had another boyfriend. The victim told Officer Robinson that Defendant slapped her and pulled her hair. When she ran outside of the house, Defendant followed her and said that he was going to kill her. The officer noticed bruises on the victim's left arm.

Defendant was also seen arguing with the victim on two occasions in the parking lot of the hotel where Defendant and the victim had been staying and where her body was later found a few days prior to her disappearance. As pointed out by the State, these prior acts of domestic violence show "defendant's hostility toward the victim, malice, intent and a settled purpose to harm the victim." *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1994). In addition, they are evidence that Defendant killed the victim with premeditation.

The manner of the victim's death also supports a finding of premeditation. The proof in this case shows that the victim was strangled with a cable commonly used to connect a DVD player or other electronic device to a television. Defendant had made an "overhand knot" in the cable. The medical examiner testified that it would take a minimum of two to three minutes of pressure held over both carotid arteries in a "continuous fashion" to cause the victim's death in that manner. The medical examiner further noted that when the carotid arteries are compressed, a person "will go unconscious in a few seconds[.]" Therefore, Defendant continued to strangle the victim even after she would have lost consciousness. Defendant's DNA was also found underneath the victim's fingernails.

Defendant's actions after the murder also support a finding of premeditation. After the victim's murder, Defendant hid her body under the bed in their hotel room in an enclosed bed frame, and he placed dryer sheets with the body to conceal the odor. In order to find the victim's body, the mattress and box springs had to be removed from the bed. The victim's body was not discovered until nearly two months after her death. A

26

day or two after the victim's murder, Defendant took the victim's wallet and a DVD player to his cousin and asked his cousin to deliver the items to Defendant's uncle. At the time, Defendant was driving a gold car rather than the victim's red Mitsubishi that he was later driving at the time of his arrest.

When Defendant was arrested by police, he told Sergeant Merritt that he last saw the victim on January 26, 2010, and that he drove away from the hotel in her red Mitsubishi. Defendant also claimed that he had been living in the car from January 26, 2010, until he was taken into custody on February 2, 2010. However, there was testimony by Nathaniel Lewis that he spoke with the victim at the hotel on January 27, 2010, through the window of Room 222. He later spoke to Defendant through the window that same day. There was also testimony that Defendant used the victim's EBT card at a store on February 1, 2010, to withdraw cash. He was seen on video surveillance leaving the store in a gold sedan with an unknown driver. Defendant checked into the America's Best Hotel that same day and stayed one night.

The manner of the victim's death combined with the past acts of domestic violence against the victim by Defendant, and Defendant's actions after the murder were sufficient to support the jury's finding that Defendant acted with premeditation when he killed the victim.

In a light most favorable to the State, the proof was also sufficient to support a finding of felony murder. Defendant murdered the victim on January 27, 2010, and he left the scene in her red Mitsubishi. There was testimony that during the time period that the victim would have needed the car to pick up her children from preschool as she always did. When asked by Sergeant Merritt about how the victim would pick the children up from school if Defendant had her car, Defendant said that the victim planned to use her school loan and income tax money to purchase another vehicle. This statement was not true because the victim was dead at the time. Defendant also took the victim's wallet to his cousin, and he used her EBT to withdraw cash after her death.

In his brief, Defendant points out that Defendant was not charged with the theft of the victim's car and that Sergeant Merritt testified at trial that Defendant was not charged with theft because the victim and Defendant had been in a long relationship, and they could not prove that he did not have permission to drive the car. This court has held:

> The felony murder statute does not require that a defendant who is charged with first degree felony murder also be charged in a separate count of the indictment with the attempt or perpetration of the underlying felony, and "this court has observed 'that a felony murder indictment must allege that the killing was committed during the perpetration of a

27

felony, but specific allegations of the elements and facts of the underlying felony are unnecessary.'" *Charles Dewayne Moore v. State*, No. E2006-02261-CCA-R3-PC, 2007 WL 1890652, at *5 (Tenn. Crim. App. July 2, 2007) (quoting *State v. Alfonzo E. Anderson*, No. W2000-00737-CCA-R3-CO, 2002 WL 1558491, at *2 (Tenn. Crim. App. Jan. 9, 2002)). Moreover, this court has upheld convictions for felony murder when defendants were acquitted by the jury of the underlying felony of especially aggravated robbery. *See, e.g., State v. Michael Shane Grogger*, No. M2008-02015-CCA-R3-CD, 2009 WL 3832921, at *14 (Tenn. Crim. App. Nov. 17, 2009); *State v. Tony Scott Walker*, No. 02C01-9704-CC-00147, 1997 WL 746433 (Tenn. Crim. App. Dec. 3, 1997).

*State v. Michael Lambdin*, No. E2014-00547-CCA-R3-CD, 2015 WL 1897461, at *5 (Tenn. Crim. App. April 27, 2015).

From this evidence, a rational jury could have reasonably concluded that Defendant committed the offense of first degree felony murder. Accordingly, the judgment of the trial court is affirmed.

## III. *Merger*

Defendant contends that the trial court erred by failing to merge Defendant's convictions for first degree premeditated murder and first degree felony murder into a single judgment of conviction for first degree murder. We disagree.

In this case, Defendant was charged and convicted of two counts of first degree murder of the same victim. The trial court entered two separate amended judgments on June 20, 2014. The "Special Conditions" section of the judgments reflect that "Counts 1 and 2 Merge." Recently, our supreme court in *Marquize Berry*, _____ S.W.3d _____ at _____, No. W2014-00785-SC-R11-CD, order granting Tenn. R. App. P. Rule 11 at 5 (Tenn. Nov. 16, 2015), addressed this issue. The court stated as follows:

> [W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document *for each count*. The judgment document for the greater (or surviving) conviction should reflect the jury verdict on the greater count and the sentence imposed by the trial court. The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the "Special Conditions" box that the

28

conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the "Special Conditions" box on the uniform judgment document for the greater or surviving conviction.

.    .    .

When the jury returns guilty verdicts on multiple offenses that eventually will be merged, the best practice is for the trial court to impose a sentence on each count and reflect the sentence on the respective uniform judgment document.

*Id*. at \*5 (emphasis in original).

Thus, the trial court in this case did not err by entering two separate judgments for Defendant's first degree premeditated murder and felony murder convictions. However, we do find that the trial court's notation in the "Special Conditions" section that "Counts 1 and 2 Merge" should be changed in both judgments to reflect that Defendant's felony murder conviction in Count 2 merges with his premeditated murder conviction in Count 1. Therefore, we remand the matter for entry of corrected judgment forms.

Therefore, we affirm the convictions for first degree premeditated murder and felony murder and remand the case to the trial court for entry of corrected judgment forms.

_____
THOMAS T. WOODALL, PRESIDING JUDGE